EXCHANGE NAT. BANK OF SPOKANE v. BANK OF LITTLE ROCK.

(Circuit Court of Appeals, Eighth Circuit. October 16, 1893.)

No. 268.

1. NEGOTIABLE INSTRUMENTS — BONA FIDE HOLDERS — RAISED DRAFT—PROXI-MATE CAUSE OF LOSS.

A bank clerk, whose duty it was to prepare exchange for the cashier's signature, so drew a draft for $25 to his own order that the amount could be readily altered, and, after procuring the cashier's signature by

pretending that he wished to make a remittance of that amount, altered the draft so that it presented the appearance of a genuine draft for $2,500, and thereafter indorsed it, and procured it to be discounted. *Held*, that the forgery by the clerk, and not the negligence of the bank, was the proximate cause of the loss, and the bank was not liable therefor.

2. SAME—LIABILITY OF BANK—FRAUD OF CLERK.

The bank was not liable on the ground that the forger was its confidential employe, because in this transaction he acted as a purchaser, and not as an employe, and because the purchase of the draft was complete, and he was the owner of it, when the forgery was committed.

In Error to the Circuit Court of the United States for the Eastern District of Arkansas.

At Law. Action by the Exchange National Bank of Spokane, Wash., against the Bank of Little Rock, Ark., to recover the amount of a draft raised after its issue by defendant. Judgment for defendant. Plaintiff brings error. Affirmed.

Statement by SANBORN, Circuit Judge:

The Exchange National Bank of Spokane, Wash., plaintiff in error, brings this writ of error to reverse a judgment of dismissal of an action brought by it against the Bank of Little Rock, Ark., the defendant in error, to recover the amount of a draft for $2,500 which had been raised from $25 after the defendant issued it, and before the plaintiff bought it. One D. C. Jordan, an employe of the defendant, whose business it was to prepare the exchange for the cashier to sign, drew a draft of the defendant on a New York bank, payable to his own order, for $25, for the cashier to sign, under the pretense that he wished to make a remittance to his brother. He so wrote the words "twenty-five" that there was room in the blank just after it to insert the word "hundred." He so punched the figures "$25" that there was room just after them to insert with the punch two ciphers and a star in the usual manner, and he so wrote the figures "$25" that there was room immediately after them to insert two ciphers. In this condition he presented the draft to the cashier, who examined it, saw the way in which it was written and punched, and then signed it, and delivered it to Jordan. The latter then made the insertions of the words and figures he had left room for, and the paper became a fair draft for $2,500, without any erasure, interlineation, or other mark to excite suspicion of the alteration. This is a copy of the altered draft:

| (Punched.) | | |
|---|---|---|
| **$2500** ‡ | BANK OF LITTLE ROCK. | $2500.00 |
| | LITTLE ROCK, ARK., Mar. 8, 1890. | |
| Duplicate Unpaid. | | |
| Pay to the order of D. C. JORDAN, | | No. 3539. |
| Twenty-five Hundred. . . . . . . . . . . . . . . . . . . . . . Dollars. | | |
| | Original. | |
| To CHEMICAL NATIONAL BANK, | | C. T. WALKER, |
| New York City. | | Cashier. |

After making the alterations, he indorsed this draft to a fictitious person, indorsed the name of the fictitious person upon it, and delivered it to a third person, who was identified at the bank of the plaintiff, and at whose request the plaintiff discounted the draft in good faith, for value, and without notice

or suspicion of any alteration in it: The court below held that the draft was a forgery, and imposed no liability on the defendant, and this is the supposed error complained of.

S. R. Cockrill and George H. Sanders, for plaintiff in error.

Dan W. Jones and W. S. McCain, for defendant in error.

Before SANBORN, Circuit Judge, and THAYER, District Judge.

SANBORN, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

There is a decided conflict of authorities over the question whether the maker of commercial paper or the innocent purchaser of it should bear the loss resulting from a fraudulent and unauthorized alteration in its terms or amount after its issuance and before its purchase, where the drawer or maker writes it so carelessly that the alteration may be made without exciting any suspicion of the forgery.

It is said that the drawer should suffer the loss, because his carelessness invites the forgery, on the principle that where one of two innocent parties must suffer from the fault of a third he shall sustain the loss who put it in the power of a third to occasion it. It is said that he should bear the loss, because when he issues the paper he represents to the commercial world that the draft or note is genuine, and because confidence in negotiable paper will be lessened if makers are allowed to repudiate alterations which they have invited. These are but some of the reasons assigned for charging the maker of the paper with the loss. They are good reasons for holding the maker of negotiable paper liable for any loss of which his carelessness is the proximate cause. If he carelessly intrusts checks or notes having blanks therein that were evidently intended to be filled, to a third party, who subsequently fills up and sells them, or if he intrusts to a confidential clerk the duty of filling the blanks in notes or drafts he has assigned or indorsed, and the clerk inserts excessive amounts, he cannot defend against such paper in the hands of an innocent purchaser, and the reasons referred to above fairly apply. In such cases the loss is the natural and probable consequence of his own negligence, a loss that he might have and ought to have foreseen, a loss the risk of which he fairly assumes by his own acts. But when the drawer has issued a draft or note complete in itself, but in such a form as to be easily altered without attracting attention, and it is afterwards fraudulently raised by a third person, without his knowledge or authority, and then bought by an innocent purchaser, it is not his negligence, but the crime of the forger, that is the proximate cause of the loss. Forgery and consequent loss cannot be said to be the natural or probable consequence of issuing a draft inartificially drawn. The presumption is that dealers in commercial paper are honest men, and not forgers, and that such paper will not be changed. It will not do to say that every one whose negligence invites another to commit a crime is liable to a third party for the loss the latter sustains thereby. One who, by carelessly leaving a pile of shavings

near his house, invites another to commit the crime of arson that results in the burning of his neighbor's buildings, is not liable to his neighbor for that loss. The farmer who negligently turns his horse into the highway, and thereby invites a thief to steal it, does not thereby lose title to his horse when an innocent purchaser has bought him of the thief. Nor is there, in our opinion, any sound reason why the liability of the maker of a promissory note or bill of exchange, complete in itself when issued, but subsequently fraudulently raised without his knowledge or authority, should be measured by the facility with which a third person has committed the crime of forgery upon it, or why he should be held liable for the loss resulting from such a forgery. The altered contract is not his contract. His representation was not that the forged contract was his, but that the original contract was his, and the rule caveat emptor makes it the duty of the purchaser when he buys it, and not of the maker, to then see that it is genuine. To cite and attempt to distinguish the decisions upon this question would be a work of supererogation. The authorities have all been carefully reviewed, and the conclusion to which we have arrived has been reached in Holmes v. Trumper, 22 Mich. 427, by Mr. Justice Christiancy, with whom Chief Justice Campbell and Justices Graves and Cooley concurred; in Bank v. Stowell, 123 Mass. 196, by Chief Justice Gray, without dissent from any member of the supreme judicial court of Massachusetts; in Burrows v. Klunk, 70 Md. 451, 17 Atl. Rep. 378; in Bank v. Clark, 51 Iowa, 264, 1 N. W. Rep. 491; in Fordyce v. Kosminski, 49 Ark. 40, 3 S. W. Rep. 892; and in Goodman v. Eastman, 4 N. H. 455; while the decisions in Simmons v. Atkinson & Lampton Co., 69 Miss. 862, 12 South. Rep. 263; Charlton v. Reed, 61 Iowa, 166, 16 N. W. Rep. 64; and Angle v. Insurance Co., 92 U. S. 330, 340,—are to the same effect. This question has been much discussed, and the authorities differ, but we think the better reasons, the most forcible and convincing opinions, and the marked trend of the later decisions support the view of the court below.

But it is said that this case is an exception to the decisions and the reasoning to which we have referred because this draft was raised by the confidential clerk and employe of the bank. The answer is that this was a transaction between the bank on one side and Jordan, the clerk, as a purchaser of the draft, on the other. Whatever may have been their relations in other matters, in this they dealt at arm's length as vendor and purchaser. Moreover, it was not until after the draft had become a perfect instrument, had been signed by the cashier, and completely delivered to the purchaser, that it was raised. Certainly Jordan was not then acting for the bank, or in his capacity as its clerk. The bank did not employ or confide in him to remit or dispose of this draft after he had purchased it. He was then acting in his own behalf, and using his own property.

The judgment below is affirmed, with costs.